UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMIL KOLLIE, | Civil Action No. 18-9749 (MCA) |
| Petitioner, | |
| v. | OPINION |
| ERIN NARDELLI, ASSOCIATE ACTING ADMINISTRATOR, et al., | |
| Respondents. | |

This matter has been opened to the Court by Petitioner Jamil Kollie's ("Petitioner" or "defendant") filing of a Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Having reviewed the Petition, Respondent's Answer, and the relevant record, the Court denies the Petition for the reasons stated in this Opinion and also denies a certificate of appealability ("COA").

### I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Petitioner Jamil Kollie was convicted of first-degree robbery, N.J.S.A. 2C:15–1, second-degree unlawful possession of a weapon, N.J.S.A. 2C:39–5(b), second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39–4(a), and third-degree theft by unlawful taking, N.J.S.A. 2C:20–3(a), as a lesser-included offense of carjacking, N.J.S.A. 2C:15–2. The trial court sentenced defendant to an aggregate term of fifteen years, with an eighty-five percent period of parole ineligibility, subject to the No Early Release Act (NERA), N.J.S.A . 2C:43–7.2.

---

[1] The factual background is taken from the state court record, including the New Jersey Appellate Division opinions denying Petitioner's direct appeal and PCR.

*See State v. Kollie*, No. A-4620-12T32014, WL 8390332, at *1 (N.J. Super. App. Div. Apr. 2, 2015).

In its decision denying Petitioner's direct appeal, the New Jersey Appellate Division summarized the factual background of Petitioner crimes as follows:

> In the early evening hours of January 19, 2011, defendant robbed a man named Jones at gunpoint at the corner of Schley Street and Chancellor Avenue in Newark. The robbery, as well as significant events preceding and following it, were captured by video surveillance cameras.
>
> In the minutes preceding the robbery, defendant was milling about inside the convenience store located on the opposite corner. The store's internal surveillance system captured defendant as he faced one of the cameras. The recording was dated January 19, 2011, and was time-stamped at around 6:30 p.m. Defendant was filmed wearing a green hoodie with what appeared to be white bleach stains, underneath a distinctively patterned, black and grey ski jacket. Defendant also wore a skull cap and blue jeans. He could be seen talking on a cellphone, and conversing with other young men who walked about the store.
>
> The owner of the convenience store testified that defendant was a frequent visitor. He usually saw defendant in his store multiple times a day. The convenience store owner identified defendant in court as the same person depicted in his store's video surveillance.
>
> An exterior video camera filmed defendant—identifiable by his jacket and stature, but not his face, cross Chancellor Avenue from the direction of the convenience store. He was captured on video as he waited on the corner. At one point, he walked back to apparently meet someone in the middle of Chancellor Avenue, then returned to the corner where he had been standing. He waited under the sign of a bodega, steps from the Mercedes that Jones had parked several minutes earlier on the left side of Schley Street.
>
> Jones had stopped to shop on Chancellor Avenue, a few stores down from the convenience store. As he returned to leave, heading for the curb and the driver's side door, he walked in the space between the Mercedes and a car parked behind it. Defendant confronted Jones before he reached the sidewalk. Defendant removed a handgun, and demanded money from Jones. Defendant wore a mask that covered his chin, mouth, and the lower part of his nose. The gun was visible at various points in the exterior video

surveillance. So was defendant's bleach-stained hoodie and patterned ski jacket. Jones was wearing a checkerboard, lumberjack-style jacket.

Jones attempted to comply with defendant's demands. He fumbled, and dropped a ten dollar bill to the ground. As he bent down to pick it up, defendant pointed the gun at Jones's head. Jones testified that he "tried to talk to him" and asked defendant "[']You okay brother, why are you doing this to me?['] And then [defendant] just said, [']Shut up and give me the money. [']" After Jones was unable to produce more than a modest amount of cash, defendant threatened to shoot Jones in his knees.

The confrontation had lasted about sixty seconds when Jones proposed that defendant allow him to go into the bodega on the nearby corner to get more money from an ATM. Defendant agreed, after taking Jones's car keys. Defendant then followed Jones as far as the corner.

Jones actually had no intention of returning with more money. At one point, he opened the door facing Chancellor Avenue and leaned out, to see if defendant was still there. Another exterior video camera captured the scene. Jones was filmed from the back, in his lumberjack-style jacket, leaning out of the doorway, looking toward the corner and defendant. Defendant was standing on the corner facing Jones and the surveillance camera. Although defendant's face was not discernable in the footage, his patterned ski jacket and hoodie were. Jones testified that defendant's mask was lowered. Defendant again demanded money.

Jones called 911 from the market and remained inside. After a brief wait, defendant fled the scene. He and another man were filmed as they walked toward the Mercedes. Defendant tossed the keys to the other man who drove off with defendant.

Jones gave a statement to police the night of the robbery. The police retrieved the various video surveillance footage. They found a match between the individual depicted in the store video, and a young man who was the subject of a recent police field inquiry. Two days after the robbery, Jones identified defendant from a photo array. Defendant was arrested wearing the same black and grey ski jacket captured on the video.

*Kollie*, 2014 WL 8390332, at *1-3.

Prior to trial, Petitioner moved to exclude the out-of-court identifications made of him. A *Wade*[2] hearing was conducted on April 16 and May 11, 2012, before the Honorable Michael L. Ravin, J.S.C. *See* Exhibits 3-4. Judge Ravin heard testimony from Jones; Newark Police detective Emanuel Miranda, who led the robbery investigation; and Essex County Prosecutor's Office lieutenant Jose Ramirez, an otherwise uninvolved officer who administered the photo array. *See* Exhibits 3-4; *see also Kollie*, 2014 WL 8390332, at *3. On June 20, 2012, in a comprehensive written opinion, Judge Ravin denied the motion to suppress Jones's out-of-court identification, and issued an order to that effect. *See* Exhibit 12 at 71-107.

As explained by the Appellate Division, the identifications were a central part of the state's case and Petitioner's defense:

> The principal witnesses at trial were Jones and the convenience store owner, as well as Miranda, Ramirez, and the officer who arrested defendant. The State introduced evidence of Jones's out-of-court identification. Jones also identified defendant in court as the person who robbed him. As noted above, the convenience store owner identified defendant as the regular customer who wore the distinctive ski jacket—the same jacket worn by Jones's assailant, as depicted in the exterior videos near the bodega.
>
> Defendant did not testify and presented no witnesses. The theme of the defense was that Jones's identification was unreliable.

*See id.*

On direct appeal, Petitioner asserted in relevant part that the trial court erred in denying his motion to suppress the victim's out-of-court identification in violation of state[3] and federal law. *See* Exhibit 12; *Kollie*, 2014 WL 8390332, at *1. The Appellate Division denied Petitioner's

---

2     *United States v. Wade*, 388 U.S. 218 (1967).

3     The Appellate Division first rejected Petitioner's claim that the trial court applied the wrong standard <u>under state law</u> by failing to apply the New Jersey Supreme Court's decision in *State v. Henderson*, 208 N.J. 208 (2011), and determined that the proper standard mirrored the federal standard for identification evidence, which is set out in *Manson v. Brathwaite*, 432 U.S. 98 (1977)). *See Kollie*, 2014 WL 8390332, at *3-4.

direct appeal on all claims, including the identification claims, *see id.* at *3-7, and affirmed his conviction and sentence. *See id.* at *10. The New Jersey Supreme Court denied certification on July 10, 2015. *State v. Kollie*, 222 N.J. 18 (2015).

Petitioner subsequently filed a petition for postconviction relief ("PCR petition"), asserting ineffective assistance of counsel in connection with the failure to raise an alibi defense, which was denied without a hearing, and the Appellate Division affirmed the denial of PCR, finding that Petitioner failed "to show that any failure to investigate alleged alibi witnesses caused him prejudice." *State v. Kollie*, A–1591–16T3, 2017 WL 5619279, at *1 (N.J. Super. App. Div. Nov. 21, 2017). The New Jersey Supreme Court denied certification on March 26, 2018. *State v. Kollie*, 233 N.J. 209 (2018).

Petitioner thereafter filed the instant federal habeas Petition, dated May 15, 2018, which raises a single ground for relief, asserting that the identification evidence was admitted at trial in violation of the United States Constitution. *See* ECF Nos. 1, 3, 4. Respondents submitted their answer and the relevant record on June 27, 2019, ECF No. 10, and Petitioner has not submitted a reply. The matter is fully briefed and ready for disposition.

## II. STANDARD OF REVIEW

Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub. L. No. 104-132, tit. I, § 101 (1996), 28

U.S.C. § 2244, federal courts in habeas corpus cases must give considerable deference to determinations of state trial and appellate courts. *See Renico v. Lett*, 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated a petitioner's federal claim on the merits,[4] a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 567 U.S. 37, 40-41 (2012) (quoting 28 U.S.C. § 2254(d)).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of t[he Supreme Court's] decisions," at of the time of the relevant state-court decision. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529

---

[4] "For the purposes of Section 2254(d), a claim has been 'adjudicated on the merits in State court proceedings' when a state court has made a decision that (1) finally resolves the claim, and (2) resolves th[at] claim on the basis of its substance, rather than on a procedural, or other, ground." *Shotts v. Wetzel*, 724 F.3d 364, 375 (3d Cir. 2013) (citation and internal quotation marks omitted).

U.S. 362, 412 (2000)). A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d) (1) if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." *Williams*, 529 U.S. at 405-06. Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of the AEDPA necessarily apply. First, the AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 29 U.S.C. § 2254(e)(1); *see Miller–El v. Dretke*, 545 U.S. 231, 240 (2005). Second, the AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir.

2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004). This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*, 504 F.3d at 365-66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007); *see also Gray v. Netherland*, 518 U.S. 152 (1996), and *Coleman v. Thompson*, 501 U.S. 722 (1991)). If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

To the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[u]nder 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

### III. ANALYSIS

The Supreme Court's decisions in *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Brathwaite*, 432 U.S. 98 (1977), set forth the standard for when the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement. The Supreme Court

emphasized, first, that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. *Id.*, at 107; *Biggers*, 409 U.S. at 198. Crucially, "[e]ven when the police use such a procedure, the Court next said, suppression of the resulting identification is not the inevitable consequence." *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012) (citing *Brathwaite*, 432 U.S., at 112–113; *Biggers*, 409 U.S. at 198–199). As explained by the Court, "[a] rule requiring automatic exclusion … would 'g[o] too far,' for it would 'kee[p] evidence from the jury that is reliable and relevant,' and 'may result, on occasion, in the guilty going free.' *Id.* (citing *Brathwaite*, 432 U.S., at 112; *see id.*, at 113 (when an "identification is reliable despite an unnecessarily suggestive [police] identification procedure," automatic exclusion "is a Draconian sanction," one "that may frustrate rather than promote justice")).

Thus, instead of mandating a per se exclusionary rule, the Supreme Court held that the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a "substantial likelihood of misidentification." *Biggers*, 409 U.S. at 201; *see Brathwaite*, 432 U.S. at 116. "[R]eliability [of the eyewitness identification] is the linchpin" of that evaluation. *Id.* at 114. Where the "indicators of [a witness'] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed. *Id.* at 114. Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury.

The "factors to be considered" in evaluating a witness' "ability to make an accurate identification" are as follows: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the

confrontation." *Perry*, 565 U.S. at 239 n. 5 (citing *Brathwaite*, 432 U.S. at 114-116) (citing *Biggers*, 409 U.S. at 199–200).

Under this "totality of the circumstances" approach, *id.* at 110, the Court held in *Biggers* that law enforcement's use of an unnecessarily suggestive showup did not require suppression of the victim's identification of her assailant because the identification was reliable. 409 U.S., at 199–20. The victim saw her assailant for a considerable period of time under adequate light, provided police with a detailed description of her attacker long before the showup, and had "no doubt" that the defendant was the person she had seen. *Id.*, at 200 (internal quotation marks omitted). Similarly, the Court concluded in *Brathwaite* that police use of an unnecessarily suggestive photo array did not require exclusion of the resulting identification. 432 U.S. at 114–117. The witness, an undercover police officer, viewed the defendant in good light for several minutes, provided a thorough description of the suspect, and was certain of his identification. *Id.* at 115. The Court found that the "indicators of [the witness'] ability to make an accurate identification [were] hardly outweighed by the corrupting effect of the challenged identification." *Id.* at 116.

Here, the Appellate Division did not unreasonably apply clearly established federal law when it rejected Plaintiff's identification claim.[5] The Appellate Division analyzed the admission of Jones's out-of-court identification as follows:[6]

> [W]e analyze the admission of Jones's out-of-court identification pursuant to the *Manson/Madison* test. In determining the admissibility of identification testimony, "[r]eliability is the linchpin[.]" *Manson*, *supra*, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L. Ed.2d at 154. To determine whether to exclude an identification, a court must "first ... ascertain whether the identification procedure

---

[5]  See *State v. Madison*, 109 N.J. 223, 232–33 (1988) (adopting the standard for reviewing identification evidence set forth in *Manson v. Brathwaite*, 432 U.S. 98, 110 (1977)).

[6]  Footnotes 6-9 are reproduced from the Appellate Division's opinion.

was impermissibly suggestive, and, if so, whether the impermissibly suggestive procedure was nevertheless reliable." *State v. Herrera*, 187 N.J. 493, 503–04 (2006) (citing *Manson*, *supra*, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L. Ed.2d at 154), and *Madison*, *supra*, 109 N.J. at 233.

As for the first step:

> "Impermissive suggestibility is to be determined by the totality of the circumstances of the identification. It is to be stressed that the determination can only be reached so as to require the exclusion of the evidence where all the circumstances lead forcefully to the conclusion that the identification was not actually that of the eyewitness, but was imposed upon him so that a substantial likelihood of irreparable misidentification can be said to exist."

[*Manson*, *supra*, 109 N.J. at 234 (quoting *State v. Farrow*, 61 N.J. 434, 451 (1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1396, 35 L. Ed.2d 602 (1973) (emphasis omitted)).]

In considering the second step, the court must consider whether the procedure created a "very substantial likelihood of irreparable misidentification." *Madison*, *supra*, 109 N.J. at 232 (internal quotation marks and citation omitted). "If the court finds that the identification is reliable despite the impermissibly suggestive nature of the procedure, the identification may be admitted into evidence." *Ibid.*

The test requires a court to weigh the suggestive nature of the procedure against the identification's reliability. *Id.* at 233. In assessing reliability, a court must consider five factors: " 'the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.'" *Herrera*, *supra*, 187 N.J. at 507 (quoting *Manson*, *supra*, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154).

We attach "very considerable weight" to the trial court's findings in a *Wade* hearing. *State v. Adams*, 194 N.J. 186, 203 (2008) (internal quotation marks and citation omitted). "That is, the trial court's findings that photographic identification procedures were reliable should not be disturbed if there is sufficient credible evidence in the record to support the findings." *Ibid.*

Applying these standards, we shall not disturb Judge Ravin's determination that the photo identification was not impermissibly

suggestive; and even if it was, the identification was nonetheless reliable.

Defendant argues that the photo array was impermissibly suggestive because defendant alone was depicted wearing a bright red-orange hooded sweatshirt over a white tee-shirt. In the photograph, the hood was down, and lined with a contrasting light tan and white stripe fabric. Consequently, the garment created a wide red ring around defendant's neck, with the tan fabric laying in folds on his shoulders. White pull-strings dropped down across defendant's upper chest. The fillers, by contrast, were dressed in tee-shirts that were bluish-grey, white, or black.

In his statement to Miranda the night of the robbery, Jones described his assailant as wearing a dark hoodie.[7] He said his attacker was very thin and "5'11" if more than that. It was only 6 feet if more than that." Jones told Miranda that his attacker's complexion was like his own, if not a slight shade darker. He had never seen his attacker before that night.

Jones stated that he could only see the top of defendant's face during the confrontation by the car, because the mask covered his chin, mouth, and the lower part of his nose. He said, "Back at the car. It appeared that I almost saw his face." However, Jones told Miranda that when defendant peered out of the bodega later, he had dropped his mask. In the *Wade* hearing, Jones asserted he could clearly see defendant's face.

In his interview with Miranda, Jones professed some uncertainty that he could identify his attacker, stating, "He almost had to have that same thing on because I can't tell other th[a]n that. You know, as bad as I want this clown, I cannot tell other th[a]n that at this point. I really can't, as bad as I want him man." At another point, however, Jones stated that he might be able to identify his assailant, and willingly responded to Miranda's invitation two days later to view some photos.

There was no evidence at the *Wade* hearing to support a claim that any other aspect of the photo identification process was suggestive—aside from defendant's attire. Although the process was not video—or audio-recorded—because recording rooms and equipment were allegedly unavailable—neither Miranda nor Ramirez said anything to Jones to indicate that a suspect was included among the photos; directing Jones to select defendant's photo; or confirming his selection. The fillers and defendant

---

[7] "The statement was not introduced into evidence at either the *Wade* hearing or the trial, and is not in the record before us. However, defense counsel liberally referred to Jones's statement in cross-examination in both proceedings." *Id.* at *5.

appeared to be similar in age and physical appearance. They were similar in complexion and facial features, and all had short-cropped hair. The officers testified that their photo system was incapable of selecting fillers dressed in hoodies, and police did not have a photo of defendant dressed in something else.

Jones asserted that he selected defendant's photo, which was third in the individually presented array, because he recalled defendant's eyes. Ramirez testified that Jones paused when he first examined defendant's photo. After viewing all the photos in the array, Jones asked to see defendant's photo again, and then stated he could not forget his eyes, and that defendant was the person who robbed him. He expressed confidence that his identification was accurate.

We agree that displaying defendant in a hoodie was suggestive, given Jones's description of his attacker. Moreover, the bright color may have drawn attention to defendant's photo, which contrasted with the photos of the fillers, who were dressed in white, black, or grey shirts. Defendant's attire is particularly problematic because Jones indicated that his ability to identify his attacker might depend on seeing him in the same clothing he wore during the robbery. A photo array should not be composed in such a way that the suspect's photo stands out among the rest. *See Herrera*, supra, 187 N.J. at 515–17 (including in an appendix Attorney General's Guidelines for conducting photo lineup); *see also Henderson*, supra, 208 N.J. at 251–52.[8]3

Nonetheless, given our standard of review, we are not prepared to disturb Judge Ravin's conclusion that that the photo array was not impermissibly suggestive. While defendant wore a hoodie in the photo, the court found it was not reminiscent of defendant's attire the night of the robbery, when, by contrast, Jones said his attacker wore a dark hoodie, which was pulled up over his head. Trial evidence highlighted the color contrast. The color video from the

---

[8]   "The trial court held that selecting a photo of defendant in a hoodie actually complied with another Attorney General guideline, which directs police to '[s]elect a photo that resembles the suspect's description or appearance at the time of the incident.' *See Herrera*, supra, 187 N.J. at 516 (quoting guideline I(E)(3)). We construe the guideline differently, to pertain to the suspect's physical appearance at the time of the incident (implicating features like facial hair, weight, hair color, complexion), and not clothing which may suggest that a viewer select a person despite differences in physical appearance. At the very least, a defendant's photo should not be the only one in an array depicting a distinctive article of clothing that an offender wore at the time of an incident in question. For example, if a victim stated that his attacker wore a N.Y. Yankees baseball cap, it would be suggestive to display only one photo of a person in such a cap, as it may mislead the viewer into making a positive identification. On the other hand, there would be nothing wrong with displaying six photos in which all subjects were dressed in such a cap." *Kollie*, 2014 WL 8390332, at *6.

convenience store showed defendant in a forest green hoodie. Outside, under the street lights, it surely appeared dark to Jones— far different from the brightly colored sweatshirt that defendant wore in the photo used in the lineup. The court found that neither the testimony nor exhibits indicated that Jones selected defendant's photo based on his attire. The court found that the selection of defendant's photo was not a purposeful departure of the Attorney General's guidelines. In no other respect did the police suggest to Jones that he select defendant's photo. [Footnote omitted.]

The trial court proceeded to the second prong of the Manson/Madison analysis, and concluded that even if the photo array was suggestive, it did not taint Jones's identification. We agree. "[W]eighing the suggestive nature of the procedure against the reliability of the identification," *Micelli*, supra, 215 N .J. at 291, the reliability predominates after considering the five factors described in *Herrera*.

According to the testimony at the *Wade* hearing, Jones had ample "opportunity ... to view the criminal at the time of the crime," and had an elevated "degree of attention." *Id.* at 292 (internal quotation marks and citation omitted). The trial evidence only confirmed those factors. Although Jones admitted he was under stress, and fumbled with money, he was face to face with defendant for roughly a minute, as depicted on the video presented at trial.[9] Jones testified that he tried to reason with defendant. The video also reflected that although it was nighttime, the street-lighting was more than adequate. Moreover, once Jones was in the relative safety of the bodega, he peered out and was able to see defendant facing him, with his mask removed. Defendant also expressed unqualified confidence in his selection of defendant from the photo array. [Footnote omitted].

Jones's prior description of defendant was accurate. He stated defendant was about 5'11" and very thin. The officer who arrested defendant testified that defendant described himself as 5'10" tall and 150 pounds. [Jones] also accurately described defendant as wearing a dark hoodie, which was confirmed by the trial videos.

---

[9] "We do not rely on trial evidence of defendant's guilt to corroborate Jones's identification. *See Manson*, *supra*, 432 U.S. at 116, 97 S.Ct. at 2254, 53 L. Ed.2d at 155 (stating that evidence of defendant's guilt "plays no part in our analysis" of identification's reliability); *see also United States v. Emanuele*, 51 F.3d 1123, 1128 (3d Cir.1995) (stating "[i]ndependent evidence of culpability will not cure a tainted identification procedure"). Rather, we rely on trial evidence related directly to the reliability of the identification. *See ibid.* (stating "only factors relating to the reliability of the identification will be relevant to a due process analysis")." *Kollie*, 2014 WL 8390332, at *6.

> The video evidence at trial indicated more generally that Jones accurately recalled significant details of the crime.
>
> Finally, the time between the crime and the confrontation was relatively brief. The crime occurred in the evening of January 19, 2011. Jones identified defendant sometime on January 21, 2011—apparently less than forty-eight hours later. *See Adams*, *supra*, 194 N.J. at 204–06 (finding that out-of-court identifications were reliable where, among other factors, they were conducted within two days of the incident, which the Court characterized as a "relatively short" time period). In sum, we discern no error in the decision to admit Jones's out-of-court identification.

*Kollie*, 2014 WL 8390332, at *3–7.

Here, the Appellate Division determined that even if the arrangement was suggestive, the identification was nevertheless reliable. The Appellate Division addressed the correct factors at length, *i.e.*, "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation[,]" *see Perry*, 565 U.S. at 239 n. 5 (citing *Brathwaite*, 432 U.S. at 114-116 (citing *Biggers*, 409 U.S. at 199–200), and determined that the identification was reliable. In this regard, the Appellate Division focused on the following facts: that Jones was able to view Petitioner at the time of the crime for an adequate amount of time in adequate lighting; that Jones accurately described Plaintiff's height, weight, and complexion, that Jones was able to see Petitioner's unmasked face once Jones was in the Bodega; that Jones expressed "unqualified confidence" in his selection of Petitioner from the photo array and that his confidence was based on his recognition of Petitioner's eyes and not the fact Petitioner was wearing a hoodie; and the fact that Jones identified Petitioner less than 48 hours after the crime. The Appellate Division also explicitly noted that it did not rely on any evidence of Petitioner's guilt to find that the identification was reliable and instead confined its analysis to the relevant factors. Because the

Appellate Division did not unreasonably apply the standard or the facts in finding that the identification was reliable, the Court denies relief on Ground One.

## IV. CERTIFICATE OF APPEALABILITY

Having denied relief as to Ground One, the only claim in the Petition, the Court will also deny a Certificate of Appealability ("COA"). Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding unless he has "made a substantial showing of the denial of a constitutional right." Because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court will deny a COA.

## V. CONCLUSION

As explained in this Opinion, the Court denies the Petition and denies a COA. An appropriate Order follows.

_____
Hon. Madeline Cox Arleo
United States District Judge

DATED: September 13, 2021.